In re William Richard SPEARS, Barbara Jane Spears, Debtors.

Scott N. BROWN, Jr., Trustee, Plaintiff,

v.

TRADERS NATIONAL BANK, Warren County Bank, Defendants.

CENTERRE BANK, N.A., Defendant and Counter-Plaintiff,

v.

William Richard SPEARS, Barbara Jane Spears, Eddie Spears, Jeff Spears, Traders National Bank, Warren County Bank, Scott N. Brown, Jr., Trustee, and Hubbard Milling Company, Counter-Defendants, Cross-Defendants and Third-Party Defendants.

Bankruptcy No. 1–82–01823.
Adv. No. 1–82–0977.

United States Bankruptcy Court,
E.D. Tennessee.
April 13, 1984.

Robert S. Peters, Swafford, Peters, & O'Neal, Winchester, Tenn., for William Richard Spears and Barbara Jane Spears.

Scott N. Brown, Jr., Brown & Dobson, Chattanooga, Tenn., for trustee.

Thomas H. Copeland, Copeland, Conley, & Hazard, Tullahoma, Tenn., for Traders National Bank.

Keith S. Smartt, McMinnville, Tenn., for Warren County Bank.

James Frank Van Cleave, III, Ray & Van Cleave, Tullahoma, Tenn., for Centerre Bank, N.A.

Mary F. Bristow, Forrester & Richardson, Tullahoma, Tenn., for Jeff Spears and Eddie Spears.

Frank C. Lynch, Lynch, Lynch, & Lynch, Winchester, Tenn., for Hubbard Milling Company.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

This is a dispute over a herd of hogs and 448 acres of land. The court will deal first with the claims to the hog herd since all the parties assert claims to the hogs.

### Part I

The debtors, Dick and Barbara Spears, had been engaged in large scale farming for several years before they filed their petition under chapter 11 of the Bankruptcy Code. That was in September, 1982. At the time a large herd of hogs was located on farm land belonging to Dick Spears and Doyle Richardson.

Doyle Richardson is an attorney who had represented Dick Spears at various times, had participated in several business ventures with Dick Spears, and was involved in

the transaction that led to acquisition of the hogs.

Centerre Bank holds the earliest perfected security interest. The security agreement granted a security interest in any hogs belonging to Dick Spears at the time or subsequently acquired by Dick Spears.

Warren County Bank has the second earliest perfected security interest. It was perfected in 1200 pigs belonging to Dick Spears. The security agreement simply covered 1200 pigs. It did not provide for a security interest in after-acquired pigs.

Traders National Bank financed the purchase of the hogs in question, or their ancestors, after Centerre Bank and Warren County Bank had perfected their security interests. However, the transaction was conducted with the intent of making Dick Spears' sons, Jeff and Eddie, the owners of the pigs. Only Traders National Bank perfected a security interest in pigs belonging to Jeff and Eddie Spears.

Shortly before the debtors filed their chapter 11 case, Hubbard Milling began selling feed to Dick Spears. The feed was for the pigs in question. Dick Spears represented that he owned the hogs and signed a security agreement granting Hubbard Milling a security interest in "his" hogs.

The court is of the opinion that Warren County Bank does not have a security interest in any of the pigs in question. Doyle Richardson testified that there were no pigs on the farm when the pigs financed by Traders National Bank were put on the farm. Tom Strawn was the president of Traders National Bank. He and Dick Spears visited various farms belonging to Dick Spears before Traders National lent the money to buy the hogs. They visited all the farms where the pigs were to be located. Strawn didn't see any pigs on the farm or farms where the new herd was to be kept. Eddie Spears testified that his father had about 50 hogs at another farm but they were not mixed with the new herd. Jeff Spears testified that there may have been about 30 "scrubs", left over from Warren County Bank's collateral, but they were destroyed rather than mixed with the new herd.

If Warren County Bank's security interest had applied to after-acquired pigs, it could have applied to any 1200 pigs belonging to Dick Spears. Without the "after-acquired" clause, the agreement appears to have covered a particular herd of 1200 pigs that no longer existed and left no offspring among the herd in question. The result is that Warren County Bank cannot have a security interest in any of the hogs in question.

Centerre Bank could have the first perfected security interest in the pigs if they belong to Dick Spears. The main question between Centerre Bank and Traders National is whether Dick Spears owns the hogs or they belong to Jeff and Eddie Spears. The answer to this question requires a detailed review of the facts.

In March or April, 1981, Dick Spears approached Tom Strawn about obtaining a loan from Traders National Bank to establish a "feeder pig" operation and buy 448 acres of land. The loan was to be used generally as follows:

$141,000 to buy 4,700 pigs,

$70,500 to buy medication and protein supplement (feed), and

$312,000 to buy 448 acres of land.

Dick Spears represented that most of the other feed would be furnished by him from his farms. He would also manage the operation, using his facilities and labor. The pigs would all be fattened and sold in as short a time as possible. The sale proceeds were supposed to be enough to pay the entire debt to Traders National. The land would be deeded to Dick and Barbara Spears for life with the remainder to Jeff and Eddie. The gist of the plan was to use the hog operation to pay for itself and the land. Dick Spears called this "estate planning" since the proposed outcome was for the Spears family to acquire the 448 acres of land free of the purchase money mortgage.

Tom Strawn agreed in principle with the condition that Dick and Barbara Spears

personally guarantee repayment of the loan. Mr. Strawn also asked Doyle Richardson to give him a legal opinion on whether the pigs would be subject to the claims of Dick Spears' creditors since they would be on his land and under his management. Tom Strawn then turned over the handling of the transaction to Bob Graham, a vice-president of the bank.

Bob Graham met first with Tom Strawn and Dick Spears explained the proposed deal. Later, Jeff and Eddie Spears and Doyle Richardson met with Bob Graham. Jeff and Eddie Spears had not been directly involved in big transactions and asked Doyle Richardson to accompany them to the bank. Jeff and Eddie were 22 and 21 years old. They had not bought any land before. Eddie farmed about 100 acres as his own but put the income back into the family business, rather than keeping it for his own use.

Doyle Richardson thought that the purpose of the deal was to acquire the land for Jeff and Eddie Spears so they could get started on their own. He did not know that Dick and Barbara Spears would have a life estate in the land.

Jeff and Eddie and Bob Graham and Doyle Richardson discussed the mechanics of getting the loan money paid to the pig sellers and the suppliers of feed and medication. Bob Graham also advised Jeff and Eddie to avoid confusing their pigs with pigs owned by Dick Spears. Doyle Richardson warned that the pig sellers would probably invoice the pigs to Dick Spears. He advised everyone to have any incorrect invoices corrected. Jeff and Eddie opened a checking account at Traders National in the name of Spears Brothers.

The sellers did invoice the pigs to Dick Spears. Bob Graham returned the incorrect invoices to Jeff and Eddie. The invoices were returned with "Dick Spears" marked out.

Jeff and Eddie executed a separate note and security agreement each time Traders National advanced money to pay a seller. At first Traders National paid the sellers directly by using a bank money order. La-

ter the advances were credited to the Spears Brothers checking account and Jeff and Eddie wrote checks to the sellers.

All the notes were secured by the 4,700 pigs. The security agreements covered offspring but not after-acquired pigs. All the notes were made due on August 18, 1981.

On August 13, 1981, Jeff and Eddie Spears executed a note for almost $209,-000. This note consolidated all the notes arising from purchases of pigs, feed, and medication. The consolidated note was due November 15, 1981. The security agreement covered 4,700 pigs and offspring but not after-acquired pigs.

Both Jeff and Eddie Spears were salaried employees of Dick Spears. They did not claim the hogs as theirs for tax purposes. Dick Spears made the first contact with Jolley Feeder Pigs, which supplied most of the pigs. Dick Spears made the decisions about buying feed, feeding, facilities to be used, and when to sell hogs. He handled the money from the sales. He used his property and facilities and feed grown on his farms. He made the payments on the debt to Traders National. In 1982 he decided to switch from a straight feeder pig fattening operation to a farrowing operation in which the herd would maintain itself through breeding. He bought the boars needed to start the breeding. He represented to Hubbard Milling that the hogs belonged to him. There is no doubt that Dick Spears was the dominant force in this transaction with Traders National Bank and in the operation of the hog business. The question, however, is what ownership interest, if any, did he have in the hogs.

There are several ways of looking at the arrangement between Dick Spears and Jeff and Eddie Spears. First is the view that Dick Spears was the true owner of the pigs from the beginning but involved Jeff and Eddie to hide his ownership from his creditors. The court does not agree with this view of the facts.

Jeff and Eddie borrowed the money to buy the pigs. They were supposed to bene-

fit from the transaction by acquiring an unencumbered remainder interest in the 448 acres of land. There is nothing fundamentally wrong with a transaction in which the debtor agrees to manage someone else's property, or property acquired by the debtor and someone else, for their mutual benefit. This kind of transaction does not make the debtor the sole owner of the property. The debtor's prior creditors cannot complain that they were misled simply by the debtor's possession. The court concludes that Dick Spears was not the sole owner of the pigs.

If Dick Spears were a joint owner of the pigs, then Centerre Bank's security interest would have attached and would have priority over Trader's security interest. The court is of the opinion that Dick Spears was not a joint owner of the pigs.

This may have been a joint venture in which Jeff and Eddie Spears furnished *their* pigs and Dick Spears furnished the land, feed, and labor. If so, Dick Spears would have acquired at best a partner's interest in the pigs. Traders would still have a perfected security interest in the pigs. Centerre Bank's security interest would not attach to the pigs, or if it did, would not have priority over Traders' security interest. See Tenn.Code Ann. § 61–1–124.

If this was not a joint venture, then Dick Spears may have been an independent contractor who agreed to raise the pigs for an interest in the profit. An independent contractor may have a statutory or common law lien for raising animals, but the contract does not give him an ownership interest.

The court concludes that Traders National Bank, but not Warren County Bank or Centerre Bank, has a perfected security interest in the hogs.

■ Hubbard Milling Company also claims a security interest in the pigs.

Dick Spears' working arrangement with Jeff and Eddie may have given him authority to grant Hubbard Milling a security interest in the pigs, but the pigs still belonged to Jeff and Eddie. Thus, Hubbard Milling may have acquired a security interest, but it was not perfected against Traders National Bank. See, e.g., *KNC Wholesale, Inc. v. AWMCO, Inc.,* 56 Cal.App.3d 315, 128 Cal.Rptr. 345, 18 U.C.C.Rep.Serv. 1303 (1976).

Traders National has the only perfected security interest in the hogs, but the trustee in bankruptcy contends that he is entitled to a claim against the hogs, ahead of everyone else, for the expenses incurred by Dick Spears in keeping the hogs.

The typical case involves property belonging to the debtor and subject to a perfected security interest. When the debtor files bankruptcy, the property becomes property of the bankruptcy estate. 11 U.S.C. § 541. The property remains subject to the security interest, but the bankruptcy trustee may have a superior claim for the expenses incurred by the bankruptcy estate in keeping or improving the property. 11 U.S.C. §§ 506(c) & 552(b).

The problem in this case is that the hogs do not belong to the debtors.

The court, however, may not have to decide the question at the moment. The land and the hogs may be worth more than the debt to Traders National. The surplus would go to the trustee, with the result that there may be no dispute between him and Traders as to the hogs. The court must first decide the questions raised by Warren County Bank as to Traders' lien on the land. Those questions are dealt with in Part 3 of this opinion.

### Part 2

■ Hubbard Milling raised the question of whether it should have an administrative claim against the bankruptcy estate for 23 tons of bulk feed sold and delivered to Dick Spears shortly before the filing of the bankruptcy petition. The invoice for the feed was dated September 9, 1982. Dick and Barbara Spears filed their bankruptcy petition on September 13, 1982. Dick Spears did not buy bulk feed from Hubbard Milling again until October, 1982. Dick Spears testified that most of the feed was

fed after the filing of the bankruptcy petition.

Section 503(b)(1)(A) of the Bankruptcy Code provides:

> (b) After notice and a hearing, there shall be allowed, administrative expenses, ... including—
>
>> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case;
>
> . . . .

The courts have generally read the statute to mean that an administrative claim can be allowed only for debts incurred after commencement of the bankruptcy case—in other words, for debts incurred by the bankruptcy estate. See, e.g., In re Baths International, 31 B.R. 143, 10 B.C.D. 1214, 8 C.B.C.2d 1130 (S.D.N.Y. 1983) aff'g 25 B.R. 538, 9 B.C.D. 1316 (Bkrtcy.S.D.N.Y.1982); In re Hearth & Hinge, Inc., 28 B.R. 595, 10 B.C.D. 615 (Bkrtcy.S.D.Ohio 1983); In re Boogaart of Florida, Inc., 23 B.R. 157, 9 B.C.D. 849 (Bkrtcy.S.D.Fla.1982); In re Ridgewood Sacramento, Inc., 20 B.R. 443, 9 B.C.D. 14 (Bkrtcy.E.D.Cal.1982). The statute is not exactly clear on this point, but the court decisions appear to be correct for practical reasons. The court therefore holds that Hubbard Milling cannot be allowed an administrative expense claim for the feed delivered before filing of the bankruptcy petition.

█ Finally, Hubbard Milling contends that it should be allowed a secured claim for the price of the shipment because it had the right to reclaim the feed at the time of bankruptcy but Dick Spears purposely failed to list it as a creditor in the bankruptcy schedules so that it didn't receive notice in time to reclaim.

A claimant is entitled to a secured claim if it has a lien on the debtor's property or a right to set-off its claim against property of the debtor in its possession. 11 U.S.C. § 506(a). The definition of "lien" is broad enough that it might include an unpaid seller's right to reclaim delivered goods. 11 U.S.C. § 101(28).

Under the previous bankruptcy statutes, the question was much debated as to whether the right to reclaim was a lien. 4 Collier on Bankruptcy ¶ 546.04[1] (15th ed. 1983). Under the present law, Bankruptcy Code § 546(c) deals with the seller's right to reclaim. Section 546(c) apparently means that the right to reclaim is not considered a lien for bankruptcy purposes.

However, the seller may be given a lien or a priority claim if it is entitled to reclaim under § 546(c) but reclamation is denied. Hubbard Milling is in effect arguing that because of the debtors' failure to list it as a creditor it should be treated as if it still has the right to reclaim or as if it was entitled to reclaim but reclamation was denied under § 546(c).

The court does not agree with the argument. Bankruptcy or notice of bankruptcy makes no difference to whether the right to reclaim comes into existence under state law. Furthermore, lack of notice of the bankruptcy did not deprive Hubbard Milling of the ability to take the steps required for reclamation. There is no good reason for treating Hubbard Milling as if it still has the right to reclaim or as if it met the requirements of § 546(c) but was denied reclamation.

### Part 3

Warren County Bank contends that its second deed of trust on the 448 acres of land has priority over Trader National's first deed of trust. Warren County Bank challenges Traders' deed of trust on three grounds.

First, Bob Graham was the trustee under the deed of trust and executed the acknowledgement. Bob Graham was a notary public and according to his unchallenged testimony was the only person who saw all the parties sign the deed of trust. They did not all sign at one sitting.

█ The purpose of an acknowledgment is to authenticate an instrument so that it can be validly registered. Tenn. Code Ann. § 66–22–101. Authentication

means proof that the grantors executed the deed. The person who executes the acknowledgment should meet the statutory requirements of Tenn.Code Ann. § 66–22–102 and be a witness competent to testify that the grantors executed the deed. The decided cases in Tennessee indicate that the trustee under the deed of trust may take the acknowledgment without automatically rendering the acknowledgment void. *Weidman v. Templeton,* 61 S.W. 102 (Tenn.Ch.App.1900); *Reed Fertilizer Co. v. Thomas,* 97 Tenn. 478, 37 S.W. 220 (1896); see also *Napier v. Stone,* 21 Tenn.App. 626, 114 S.W.2d 57 (1937); *Home Bldg. & Loan Ass'n v. Evans,* 53 S.W. 1104 (Tenn. Ch.App.1899). There was no evidence of any imposition or wrongful conduct by Traders National in this case. The court is of the opinion that the acknowledgment was valid and the deed of trust was proper for registration.

 Warren County Bank's second argument concerns the wording of the deed of trust to Traders National and the accompanying promissory notes. The deed of trust was executed on August 5, 1981 and provides that it secures a debt to Traders National Bank in the principal sum of $523,000 "as evidenced by a promissory note of even date and due and payable on Nov. 15, 1981". The deed of trust was drafted by Doyle Richardson's law firm according to instructions from Traders National Bank as to the debt to be secured. There was no promissory note for $523,000 executed on August 5, 1981.

On that date the Spears executed two notes to Traders for the loan to buy the land. The notes were for $222,000 and $90,000. About a week later, the notes arising from the loans to buy hogs and feed were consolidated into one note for almost $209,000. Thus, when the deed of trust was executed on August 5, 1981, there were two large notes totaling $312,-000 and a number of smaller notes totaling about $209,000. The entire debt was about $521,000. There was no promissory note of August 5, 1981, in the principal amount of $523,000.

Failure to exactly identify the debts secured by a mortgage does not necessarily make the mortgage unenforceable between the parties or as to third parties. The Tennessee decisions are not much help on the facts of this case. As to third parties, the general rule is said to be as follows:

> [W]hile literal accuracy of description is not required, it is essential that the debt be defined with such reasonable certainty as to preclude the parties from substituting other debts .... It is not requisite, however, that the description be so completely certain as to preclude the necessity of extraneous inquiry.

55 Am.Jur.2d, Mortgages § 153 (1971).

This statement points out the main concern. A later party that acquires an interest in the land can find a recorded mortgage but should not have its interest subordinated to debts that the mortgage was not intended to secure. This concern remains valid even though modern mortgages, like the deed of trust in question, almost always secure not only the specific debt that the mortgage was supposed to secure but all "other debts" owed to the lender.

Obviously, the mortgage need not be so specific that a third party can tell exactly what debts are secured simply by reading the mortgage. Otherwise, the courts could not uphold an "other debt" clause. These clauses have been approved by the Tennessee courts. *United States v. Automatic Heating & Equipment Co.,* 181 F.Supp. 924 (E.D.Tenn.1960) aff'd 287 F.2d 885 (6th Cir.1961); *Murdock Acceptance Corp. v. Jones,* 50 Tenn.App. 431, 362 S.W.2d 266 (1961).

The court does not believe the misdescription in this deed of trust is fatal to its effectiveness. The deed of trust referred to a note for $523,000 due on November 15, 1981. There was no such note. However, after August 13, 1981, there were three notes due on November 15, 1981. They totaled almost $521,000. They were apparently the only notes due from the Spears to Traders National on November 15, 1981. Traders had another outstanding loan to Dick Spears but apparently he and Doyle

Richardson were both obligated on it. The history of this transaction makes clear what debts were supposed to be secured. The $523,000 amount was the total that Traders Bank agreed to lend for purchase of the hogs and the land. The facts were clear as to what debt the deed of trust was supposed to secured. The misdescription of the secured debt in the deed of trust does not make it unenforceable against Warren County Bank.

█ Warren County Bank's final argument concerns the following provision in the deed of trust:

This deed of trust shall also secure the payment of any and all renewals or extensions of said note or replacements thereof ... where the note to be secured references this deed of trust by book and page number ....

In May, 1982, the debt had been paid down from the beginning total and the Spears executed a renewal note for $394,-650.00. The note provides that it is secured by a separate "Deed of Trust Coffee Co. dated 8/5/81". Another provision says "If checked, this security agreement (if filed) should be filed in the real estate records." This is followed by a blank for the "Legal Description", which was filled in as "Rec. in Bk. # 206 pg. # 812". The deed of trust was recorded in that book at that page.

Contrary to Warren County Bank's argument, these references satisfy the requirements of the deed of trust.

The court therefore concludes that Traders National Bank has a valid first lien on the 448 acres of land pursuant to its deed of trust.

## Conclusion

The hogs have been sold and the proceeds are being held. The value of the land must be determined by appraisal or sale so that the court can determine whether the debtors have any equity in the property that may go to the trustee. If there is equity the question of the trustee's claim against the hogs may be moot.

The court further finds that there is no just cause for delaying the finality of the judgment though the court may yet have to decide the dispute between the Traders National Bank and the trustee as to his claim against the hogs.

The court will enter a judgment accordingly.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 7052.

## ORDER

In accordance with the court's memorandum of this date containing findings of fact and conclusions of law,

It is ordered that the security interest of Traders National Bank in the hog herd is superior to the security interests of Centerre Bank, Warren County Bank, and Hubbard Milling Company. The interests of the trustee, if any, will be determined at a later hearing.

It is further ordered that Traders National Bank has a valid first lien on the 448 acres of land in question.

The above orders are final orders within the meaning of Bankruptcy Rule 7054.